The case only for this afternoon to be argued of is to discuss in conference. That case is United States v. Corina Deluna. Looks like Mr. Choate gets to go first. Please go ahead. Thank you, Your Honor. Can everyone hear me okay? May it please the Court and Counsel. The hallmark of a custodial interrogation is the coercive power of law enforcement, which can be mental as well as physical. In essence, the question is, would a reasonable person in the suspect's position understand they have a restraint on their freedom? To determine this, we look at the degree of isolation, the restriction of movement, physical restraint, and coercive techniques. Appellant Corina Deluna was interviewed twice by ATF agents. The first time it was by ATF agents Beinog and McDavid, and the second time it was with Agent Beinog and Salatin. On April 27th, during roughly an hour of questioning, it's hard to tell because the recording of the interview was cut and spliced for trial, so it's not entirely possible to determine exactly how long it was, but it's roughly an hour or so, Ms. Deluna was subjected to interrogative coercion, which created isolation, which created a restriction on her movement. While there wasn't necessarily any physical restraint, such as handcuffs, her movement was not free. For example, nearly three minutes into the conversation, Agent Beinog told her that he believed about 10% of the story, but don't worry, we're going to continue talking to get to continue talking. And I should add, at no point did they ever say, you don't have to talk to us, you have right to counsel, you can leave whenever you want, you can end this whenever you want. They acted as if she owed them a conversation, and she owed them a confession or more information. Five minutes after that first exhortation by Agent Beinog, he suggested that maybe she was implicating her mother in this scheme, which she wasn't doing, but he just tossed that in there saying, are you getting your mother in trouble? Again, creating a psychological pressure on Appellant to continue talking and implicating herself. Three minutes later, he noted that he didn't want anyone else to know that they were talking to her. This creates isolation. This is the same sort of behavior that a person on the street says, hey, don't let anyone know that I'm talking to you. This is to make her feel that she can't reach out for help. They're in plain clothes, they're trying to keep their conversation secret, and- At least the argument from the government is that that was to protect her in some way, not expose that the law enforcement was dealing with her. You apparently see that differently? I do, Your Honor. United States defense attorneys, courts, probably understand that to be seen as, hey, we might develop you as a source. We might develop you as an informant. But the standard is, would a reasonable person understand that to be the case? And in this situation, it's clear that she doesn't. He's trying to make her feel that she doesn't have a choice, but to continue talking to them about the scheme that they're investigating. It goes on. Three minutes after that, he says, you're about to get us out of your hair, as long as she tells him what he wants to hear. Again, it's not an option to, you know what? This isn't going anywhere. You can end this whenever you want. He's saying, you have to give us what we want for you to make this end. This is coercion. Three minutes after that, he then says that she's beginning to implicate her sister, and that he's going to have to get in contact with her sister. And that's prying on the suspect's desire to protect her family. He's not getting exactly what he wants, so he's saying to her, fine, I'm going to go talk to your sister, unless you tell me what I want to hear. Making her feel like she has to cooperate with him, has to give him the information that he's seeking to make this end. Well, Mr. Choate, there are quite a few facts here, and you're very familiar with them. We've seen them in the brief. What would you say is both the most coercive feature of this, and what is your best case to support that the judge erred in allowing this introduction? Okay. The most coercion happens during the second interview. That's when Agent Bynock comes in. He's much angrier. He is clearly exhibiting those factors where it creates the shock, the sharp and onomous shock, that gives it rise to coercive pressures in the government's Urquidy case. She's fully on target. He's saying, we don't want to listen to your lies, and then he starts threatening to take the kids into CPS custody. He says, you are detained, and he almost explicitly says, if I don't get what I want out of you, then I'm taking you in. That's the coercive act. That's of course in the second interview, so that it comes later in their whole course of interactions. But the first interview is more subtly coercive, and it happens every three to five minutes that he says something that makes the suspect believe that they are not free to leave. And then the second part of that question, what would you say is the precedent we should be relying on to convince the jury? Well, that's what's interesting about this case. This case is distinguished from all of the cases that the United States brings forward. For example, in Urquidy, the suspect in that case was advised of their rights, was told he could terminate the interview. In Salinas, there was, in our case, they had told him that he could end it if he wanted to. And in Wright, the defendant was told two times that he wasn't under arrest and could leave, and that his Miranda rights were read to him. In Palmer, the cops weren't particularly threatening. It was a very short interaction, and the focus of the questions weren't actually what they were investigating. And in our case, obviously the questions were about what they were investigating. In Reynolds, the defendant was advised of his rights. In Mitallic, the defendant was also told he was free to leave. An attorney was present in Bleuler, and in Broussard, the defendant was given his Miranda rights. And in fact, the defendant came up and asked if he could talk to the officers. In all of these cases, some sort of warning was given to the person that they were talking just about in all these cases. And the precedent that should be followed is, out of the First Circuit, and I agree it's a sister court, but when a suspect is subjected to this kind of interrogation, where it's clear that she can't leave unless she tells the investigating agents what they want to hear, then the statements should be suppressed. Because her free, not free will necessarily, but she has been broken down and she has been made to feel that the only way to get out of this situation is by cooperating with the government. And that's not the standard. You know, Miranda is a warning label. It's telling the suspect, this is what to expect, this is what you're getting into. And ripping off that warning label leaves a suspect defenseless from the power of the federal government. Were you trial counsel? I was not. At trial, counsel told the court that, you know, a month ago, I put this on your radar. And that he had objected to the defendant's statements. But what exactly was he referring to in the record, do you know? I do not know. Was there ever a motion to suppress? I do not believe that a paper motion was ever filed. It may be that they may have had a pretrial conference and he may have, during that pretrial conference, I did not see it in any of the transcripts from pretrial conferences that they were thinking of bringing it up, unless it's just slipping my mind at the moment. Do you contest the government's view that the voluntariness claim is subject to plain error review? I don't contest that. I think that the first time it ever came up was as they were going to trial. And that was the first time that there was ever any testimony taken or argument made about it. So if we agree that plain error review applies, can you point us to any authority? Well, again, I don't know. The voluntariness challenge succeeded on comparable facts. I think that plain error is that in the circumstance where the coercion broke down the appellant's ability to resist the power of the government, other circuits have found that that is error to allow that in. The First Circuit did allow it to suppress statements that were made in similar situations where the government coerced a statement out of the individual. And I think it was error to allow these statements to be made, especially in the full context of what those statements were. And with the few minutes remaining here, there are a couple of other matters in our brief. I'd point to the sentencing disparity in this case. I recognize that the United States argument that the guidelines are what the guidelines are and that there wasn't a sentencing memo filed. There really wasn't any sort of argument made at sentencing. Again, we weren't trial counsel or sentencing counsel. However, the fact of the matter is that this is essentially a false statement case and all of the charges that she faced were maximum five-year sentences. And across the entire country and in similar cases, even with people with some background, even with people who don't necessarily do what the agents want them to do, people get far fewer than 87 months of sentences. A statutory maximum of five years would have certainly satisfied all of the remaining 3553 requirements and that this case should be sent back for sentencing looking at the fact that there was such a disparate sentence. All right, counsel. And at that, I'm going to yield the rest of my time and thank you. Counsel, I see you're not more on the brief either. When did you become involved in this case? So, I have been involved in this case from when we got hired and I assisted in the preparation of the brief. I was not admitted into the Fifth Circuit until a couple of weeks ago. I had previously been admitted back in 2006, 2008, something to that effect. Just we've never had a case here and so it's lapsed and I didn't really quite fully realize it. So, you have been involved in this case for a good while, all right, thank you. Yes, on the brief, on the brief. All right, thank you. Good afternoon and may it please the Court. Audrey Maness on behalf of the United States. This Court should affirm the judgment and sentence below. First, the confessions that appellate Karina DeLuna made during the non-custodial interviews with ATF were voluntary, non-coercive, and therefore properly admitted either under Miranda and its progeny or under 3501. Second, the District Court operated well within its discretion when it allowed the government to introduce as evidence the Barrett .50 caliber rifle as part of the government's case-in-chief. That rifle was the primary subject of at least three of the nine alleged counts. Third, the District Court also acted within its discretion when it admitted as exhibits photos of guns that were found on Ms. DeLuna's phone. Fourth and finally, the within-guideline sentence imposed by the District Court was eminently reasonable given the unique facts and posture of DeLuna's case. Before you move forward, can you shed any light on what my good colleague was asking opposing counsel about the statement at trial about a judge a month ago? I put this on your radar a little bit. I have not seen anything in the record suggesting that there was a motion to suppress filed and even in the pretrial hearing. Did something occur about a month before the trial that could have been the reference? Was there a hearing of some sort? Yes. Two court events occurred. One was the pretrial hearing in mid-July. The defendant did not challenge the recordings at that time. Was there a transcript of that? There is, and it is in the record. And then there is the first day of trial, the selection of the jury on the first day of trial. And then court reconvenes only to find that Ms. DeLuna has tested positive for COVID. So the jury is impaneled. So there is a transcript of that hearing as well. I believe it is July 18th, and then pretrial was July 12th. But in neither of those transcripts was a challenge to these two recordings raised. Well, I don't know if I would call it a concession or an acknowledgment, but opposing counsel does accept that this is plain error review. Would you agree that there is no Fifth Circuit case to that effect? I agree that there is no Fifth Circuit case to that effect. This is an unusual situation because the Federal Rule of Criminal Procedure 12b3 makes very clear that a motion to suppress evidence must be raised before trial. And generally, that is the practice that we see. Well, the district court certainly gave it substantial consideration, and there was no objection from the government, was there? Absolutely. The district court did give it substantial consideration, and the government proceeded to lay the appropriate foundation. But without objecting, not raising the 12b or whatever argument. Correct. And it may have been the heat of trial, you're in the moment, you want to make sure you get your evidence in, but the government did not raise an objection during trial when this issue came up. You can proceed. Thank you. And as I mentioned in my response, this is a unique situation because a motion to suppress was not filed, and instead the challenge was brought under 3501. There is some question as to whether 3501 is still viable. That was addressed in the Supreme Court case of Dickerson v. United States. I understand this has not been briefed. Dickerson is 530 U.S. 428. And then a couple of Fifth Circuit cases talking about 3501 likely no longer being viable is United States v. Gwanespin Portillo 514 F3rd 393. And in United States v. Seal, that's 600 F3rd 473, the court made clear that the ruling in Miranda trumps 3501. And what does Miranda require? It requires warnings to be given if the interrogation is custodial. The interrogations here were not custodial. All of the factors indicate that they were not custodial. The location of them, which were either outside of the defendant's home or inside the defendant's home, is a comfortable location. It is not in a police station or at the ATF offices. The length of them was reasonable. And the nature of the questioning was largely non-accusatory. There was some frustration by the agents, but it was a conversation. Ms. DeLuna participated willingly. There was discussions about her kids as they went by in the room or outside. It was very clearly a comfortable, voluntary conversation. There was also no restraint on Ms. DeLuna's physical movement. As this court has said in United States v. Coulter, the restraint must be significant. There was none. There was no handcuffs. There was no show of force. The agents were in plainclothes. And while the officers did not expressly say that Ms. DeLuna was free to leave, it's notable that in the very first interview that precedes these two recordings, so there's actually three interviews, one in January 2022, another in April, and the final one in August. In the January interview, which is not recorded, there's a discussion, and the interview breaks, and Ms. DeLuna's not detained. She's allowed to go about her business. The same with the April interview. The interview breaks. She's not detained, allowed to go about her business. So the standard that has been set in all of these interviews are, this is a non-detention, non-custodial, voluntary interview. There is no extreme change, as this court has talked about, in, for example, in your kitty. I wouldn't want to label it corrosive, though some might. There are some identification of risks made by law enforcement officers involving child, mother. Those do seem to raise some question, at least, that we have to consider. What can you show us is comparable that hasn't bothered this court or the Supreme Court before? I don't have a case. Well, first, what is your take on what was said about the child? And what was actually said, and what would that mean to a reasonable person? So my understanding is that the officer said, we can go down to the office and continue this conversation, and you can tell from the recording, this is in the August 2022 recording, the final interview. You can tell in the recording that the kids are running around, it's loud, there's a fair amount going on in the house. And the officer has expressed some frustration that Miss DeLuna is not being forthcoming with her answers. So we can go and talk about this at the station. She says, no, no, let's stay here. She continues to give a couple of non-answers. The officer says, no, let's go down to the station. There's an 18-year-old in the house. There's some indication that he says, can this guy watch him? Or we can get the child services to come by and watch them. And he explains in cross-examination, which is a pretty aggressive cross-examination in the record at 898 to 902, he says, I did not view that as coercive or pressure. I don't view CPS, or the comparable version in Texas, CPS as a threat. That's a regular occurrence that CPS might come sit in. These are not Miss DeLuna's kids. They are her sister-in-law's children. And they wanted to make sure a responsible adult was there. And notably- Is that part of the questioning? I'm sorry to interrupt. Yeah. Recorded talking about child services, I can get them. Is that recording? Is that coming from testimony? Do we know exactly what was said? There is the recording on the record. That part is recorded? Yes. It is recorded. It was played before the jury. And it is an exhibit to this court. And notably, while I acknowledge that the conversation got heated at that point, with the agent Beinog being frustrated, it calmed down quickly thereafter. Miss DeLuna said, no, I want to stay here. And Officer Beinog respected that, or Agent Beinog respected that, suggesting that she still had control over the conversation when she said, no, I would like to stay here. And then the conversation continued, ending without her arrest or detention. And again, while there is no case factually on point, the vast majority of circumstances here indicate a non-custodial voluntary interview. If I may address the two evidentiary rulings related to, one is an actual gun in the courtroom, and another is photos of guns used as evidence. Those were objected to under Rule 403. Of course, Rule 403 requires that the court, or allows the court to exclude relevant evidence if its probative value is substantially outweighed by unfair prejudice. Here the district court found that the Barrett .50 caliber rifle was extraordinarily probative. It was the subject of three of the counts, including a smuggling charge, and that while there might have been some, I won't say shock and awe, but it certainly left an impression, including on the court from, as you can tell from the record, it was also extraordinarily probative. And even if there was some abuse of a discretion, the defendant is required to show that that abuse or error was harmful, that is, it had a substantial impact on the jury's verdict. It did not in this case because the jury acquitted on the smuggling charge. I'm a little surprised you used shock and awe as a phrase. It's almost like, yes, it was prejudicial, but not unduly prejudicial. Absolutely, and that is the standard. It is not unduly or unfairly prejudicial. It is the subject of a significant serious crime, and the jury is entitled to see that. I think the district court got it right. The district court also got it right when it allowed the government to introduce as evidence photos of various guns. These photos had been found on Ms. DeLuna's phone. They were probative. While they were not the guns subject to the counts charged, they were probative of Ms. DeLuna's knowledge and familiarity with guns, and they went again to the smuggling count. They ended up not being harmful in any way because the jury acquitted on that count. I'm not sure of the relevance, but maybe it does have some. It seemed a little surprising, certainly up to law enforcement, that there were three interviews. It seems to me there was a substantial amount of information at least by the second, and yet nothing was done to arrest Ms. DeLuna at that time. I assume quite probably seeking more information about other participants. Is there any testimony about why she was not arrested earlier? The agent Beinog is not asked directly about why she was not arrested at a certain time. However, he does testify during cross-examination that the goal, and this was in response to questioning about the interviews themselves, the goal of the interviews was not to arrest or detain Ms. DeLuna. The goal of the agents was to get at the higher organization. They believed that these guns were being trafficked to the cartel. Two of them had been recovered in Mexico, and then a third by the time of trial. Two had been used to shoot at Mexican police members. Another had been found in a warehouse with clothing and gasoline, not in great circumstances by any means. And so the agent's goal in the multiple interviews with Ms. DeLuna was not to arrest her, and it sounds like they viewed her as a lower-level participant. It was to find out who was truly responsible for the smuggling of these weapons outside of the United States. Perhaps that's a good time for me to address the sentence. Ms. DeLuna was sentenced to 87 months. It is a within-guideline sentence. It is presumptively reasonable. This court has made clear that sentencing disparity arguments are not particularly persuasive. Disparities between a co-defendant will not by itself amount to an abuse of discretion or showing of substantive unreasonableness. And national averages, as this court said in United States v. Beaucamp, are basically meaningless. The sentence was appropriate given the particular facts and circumstances of Ms. DeLuna's case, the number of firearms involved, where some of those firearms were recovered, and then her role in guiding the co-conspirator and eventually cooperator, Ms. Medlin. So for all these reasons, we ask that the court affirm the judgment and sentence below. Let me ask you the same thing as I asked opposing counsel. Were you involved in the trial? I was not, and I was not on the briefing. Ms. Wilson ably briefed this and has since retired from our office. All right. Thank you. Yes. Thank you, Your Honor. Thank you, Your Honors. Just a few matters in rebuttal. The United States has mentioned that the goal of the interviews was to get more information about everything going on with appellant. And that may be the case, and it is absolutely very common for law enforcement to give the kind of warnings that are necessary for a person to have a full concept of what they are getting into. A target letter is sent all the time to targets or subjects of investigations, and they are encouraged to hire an attorney. And when they come in, they sign a proffer letter saying that you are giving up all of these rights and what we already know about you we're going to use against you, but if we learn something new, then we might not, other than derivative use. In this case, Agent Beinog may have been trying to get more information, but he was also trying to elicit information out of her, and he was being aggressive. He never informed appellant about her ability to terminate the conversation. In fact, during the moment when he talks about the 18-year-old taking permission, he says, and we'll have them come out and take care of the kids while you're going with us. But you're going, okay? You are. You are detained. It doesn't say you can finish this conversation right now. There is another choice for Mr. Luna that he doesn't give her knowledge of. She could say, you know what? Actually, we're done. But he is saying, you are either going to tell us here or you're going to tell us at the station, but you're telling us. That is the coercive effect of not giving these warnings is intended. That is what Miranda warnings are intended to prevent, is the government, this is what was in the Bluhler case, that you have no choice but to give us the information that we are seeking. Are you claiming all three of these were custodial? I have no knowledge of what was said during the first one because it wasn't recorded. So you're not claiming that was a custodial interrogation? I can't because I can't determine what was said during that interrogation. And it doesn't seem that Ms. DeLuna's words were used against her from that. But second and third conversations, I do think were custodial because I do think that they put undue pressure, undue coercion on her, made her feel that she had no choice but to give them the information that she wanted. And that is the very ill that is forbidden. I mean, I think that's really all the rebuttal I have, honestly. All right, Counsel. Thanks to both of you for picking up the laboring oar here on appeal and helping us understand this case. That is the end of our arguments for today. We are in recess until – actually, we are adjourned. Thank you, Your Honor.